EMERY *v.* GEORGE F. HAZELWOOD CO.
[No. 56, October Term, 1948.]

*Decided February 10, 1949.*

*Rehearing Denied March 11, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*George M. Beltzhoover, Jr.,* with whom were *D. Lindley Sloan* and *W. Carl Richards* on the brief, for the appellant.

*William M. Somerville* and *William B. Somerville* for the appellee.

GRASON, J., delivered the opinion of the Court.

This suit was instituted in the Circuit Court for Allegany County by The George F. Hazelwood Company against Robert L. Emery, Jr., trading as Emery Motor Coach Lines, and The Merchandise Mart, Incorporated, for materials furnished and labor done in the alteration of a building owned by the Merchandise Mart and rented by it to Emery. The case was tried before the court, without the aid of a jury, a verdict was rendered against Emery, and from a judgment entered thereon he appeals to this court.

It is admitted that the alterations of the building were properly made, and that the bill rendered by plaintiff is fair and just. The only dispute is who ordered the

work done. Each of the defendants denies ordering it done. At the end of the plaintiff's case it entered a non-pros as to the Merchandise Mart, and the case proceeded against Emery.

The defendant, in his brief, says that Rule 1, Part Three, III, of General Rules of Practice and Procedure (1945), Code 1947, Supp. at page 2049, provides that a plaintiff cannot let a defendant out in the middle of a trial without an order of the court. No objection was made to the entry of the non-pros, and it cannot be made now.

For seventeen years Emery has operated bus lines in Virginia, West Virginia, and Maryland, mainly for the transportation of passengers. His main office is in Martinsburg, West Virginia. Sometime before October 10, 1945, he purchased a bus line operating out of Cumberland, Maryland, from the L. and A. Bus Lines, Incorporated. This company required him to immediately vacate its garage, and he had to remove the equipment he purchased from that company's garage. He was in great need of a garage in Cumberland. It was in October, and in Cumberland the weather often becomes cold in the fall of the year. He, together with Robert B. McBeth, the business manager of the Standard Oil Company in that vicinity, combed Cumberland looking for a suitable building. They found the building known as the Merchandise Mart.

William A. Douglas is vice president and general manager of the Hazelwood Company. He was called as a witness by the company and testified that he met Mr. Emery and Mr. Beacham, who is engaged in the real estate and insurance business in Cumberland, at the Merchandise Mart building for the purpose of discussing alterations to the building necessary for the occupancy of the Emery Motor Coach Lines. This was in October, 1945. Emery was interested in two large rooms on the ground floor. Between these rooms was a partition. It was necessary that a door be installed in the wall abutting Mechanic Street, and also a door in the partition

separating the two rooms, that would permit a bus to pass through. Emery went over the work in detail as to what was required. The first room was to be used for storage and the rear room was to be used as a repair shop. This change in the building required "the shoring up of a rather heavy 4-story brick walls on both sides of the building". He testified that Emery stated that there would be additional work that would develop later, such as making some work benches in the shop section of the building. Some of this work, which required the services of an engineer, was turned over by Douglas to Frank Dobson. "Our workmen then proceeded with that section of the work".

About two weeks later Douglas came to the building and saw Emery and they discussed, from a cost stand-point, the opening of the door into the building from Mechanic Street. "Mr. Beacham happened to be along but Mr. Emery was the one that made the decisions at all times as to what should be done".. After discussing the matter of costs, Emery decided to place a concrete ramp from the street as an entrance to the building. At that time Emery decided that there would not be enough clearance on the inside of the building because of "interior columns" right opposite the entrance, which would have to be removed before he could make use of the building. Douglas explained "that it required considerable shoring and some heavy steel under it to transmit the loads to the other columns" "* * * to carry the loads on the floor above", but Emery stated it was absolutely necessary. Douglas said that they handled the account on a cost-plus basis and upon completion of the work they billed the Emery Motor Coach Lines and that he made several appointments with Emery to settle the account. At no time did Emery make any objection to the charge. He stated there was no written contract covering this work but he had the verbal authorization of Mr. Emery, who did not deny the bill for a considerable period. He stated that the door and the beams used in this work were gotten from Mr. Stewart, president of

the Merchandise Mart, and that they were paid for either to Mr. Stewart or the Merchandise Mart. This witness is not clear as to the date of his first meeting with Emery, and he said: "I merely had a feeling that the contract was with Mr. Emery", but he was positive that he met Emery on two occasions.

Merl C. Boyer supervised this work. He said that Emery came on the job after the door had been cut into the Mechanic Street side and spoke about cutting another opening through the second wall. On another occasion he spoke concerning moving an interior column that was in the way of the approach to the back room, and that required a steel beam to carry the building. On another occasion he spoke about the approach on the outside of the building, a ramp and some changes in entering the building; that Emery said: "in order to hold down expenses, that he could get in the building by just a ramp at the door and the changing of the curb". Those were the only occasions he was in contact with Emery. At the conclusion of Boyer's testimony the plaintiff rested its case.

The record shows the following: "By Mr. Somerville: If the Court please, we desire to enter a non-pros as to The Merchandise Mart. By Mr. Beltzhoover: I move to dismiss as to the Emery Motor Coach Lines. By the Court: You cannot dismiss. By Mr. Beltzhoover: I move to dismiss as to the Motor Coach Lines. By the Court: Your motion is overruled. By Mr. Beltzhoover: Exception." Even if we treat this motion as one for a directed verdict, it was waived when the defendant proceeded to offer testimony.

The defendant, Robert L. Emery, Jr., was sworn as a witness. His testimony is as follows: On October 16, 1945, McBeth told him he had found a location. They went to look at it that afternoon. It was the Merchandise Mart building, known as the Footer Building. They looked through the windows from the sidewalk. Mr. Beltzhoover was with them. They met Mr. Beacham on the street and were introduced to him by McBeth, and

they told Beacham that they had been looking at the building. Beacham said he would show it to them, and after getting the keys from his office, which was nearby, he showed them the building. They entered a small door on Mechanic Street, found three rooms, two large rooms about thirty-three or thirty-four feet by eighty feet. Emery said it would not suit him in its present condition, because there was no door large enough to drive a bus through into either room. Between the rooms was a large wall with openings for two windows. Beacham said there would be no trouble in providing an entrance, and they went over to see John Stewart, the president of the Merchandise Mart, who is also secretary of the Tri-State Mine and Mill Supply, and they went to his office in the building of that company and were introduced to Stewart. Beacham told Stewart that Emery was interested in renting a portion of the building, provided an entrance could be made into it to make it suit his business. They discussed the alterations in detail. Stewart said the alterations were very minor for a building like that; he had facilities or could acquire them immediately, and have him in the building in a very short time. The rent agreed on was $150 per month for the two large rooms and a portion of the front known as the office. He stated Stewart said he had a door that was available for the purpose and took him, and Mr. Beltzhoover, to the storeroom in the Tri-State Building and showed it to them. After that they left. He was then asked if anything was said at that meeting about the costs of the alterations. He said he was not interested in the costs, but remembered Stewart talking about some figures of four or five hundred dollars. "I wasn't particularly interested in it. When we left he gave Mr. Beacham strong instructions to go immediately and contact a contractor, whose name was not familiar to me at that time and get them to come and look at the building and point out what was necessary to be done". He later learned the name of the contractor was the Hazelwood Construction Company. This meeting was on October 16, 1945. He denied he ever

made a contract with the Hazelwood Company for the alterations, but the same was to be paid for by the Merchandise Mart. He denied he ever held a conference with Mr. Douglas regarding these alterations and the price to be paid therefor. He said the first time he met Douglas was in the early part of December, and he had been in the building about a week; that he went to the building on his transportation business; that the "hole was open in the door and it was possible for the buses to be driven into the building"; that Mr. Beltzhoover was with him. It was on this occasion that Beacham introduced him to Douglas. Emery asked Douglas to make him a work bench for the use of his men; that this was the only time he talked to Douglas.

The evidence shows that the work was completed in February, 1946. Emery testified: "Sometime, the latter part of March, 1946, I received from the George F. Hazelwood Company (a bill) for approximately Four Thousand Dollars for labor and materials on the Footer Building". He said he received a number of statements from the Hazelwood Company, which were not answered orally or by letter. Douglas telephoned him about the bill, and he told Douglas "that the bill that he gave me had been forwarded to the Merchandise Mart, the people who owned the building".

On August 20, 1946, a conference was held at Emery's office in the Merchandise Mart building. Emery at that time denied responsibility for the bill and rejected a compromise offered by Stewart.

Robert B. McBeth testified he contacted Stewart and was told by him he had a place available without an entrance, "but that could be taken care of". When Emery came to Cumberland McBeth called Stewart and he was referred to Beacham, who had the keys to the place. With Beacham, Emery and Beltzhoover, he went to the building and they made detailed inspection. From there they went to see Stewart; that Stewart said that they could open up the large door, and the question came up how soon could they get in; Stewart said this could be taken care of be-

246

cause "I have the steel—I have the door." The witness said: "In discussing the entrance and the speed at which it .was to be done, I believe I offered the fact that the Hazelwood Company being close there, would be the logical people to do the work, and these gentlemen then said that they had done some work for them before, I believe, and they would make the contacts." And after further questioning he testified they said: "We will take care of that end, in *getting you in there*".

The plaintiff offered in rebuttal James W. Beacham, who testified that he was the agent of the Merchandise Mart, to show their property when leases were applied for. He stated that Emery was referred to his office by Stewart and, he thinks, McBeth was with him; that Mr. Beltzhoover was also with them. Emery asked him to show them the first floor of the Footer Building. He took them down, showed them what was vacant, and went from there to Mr. Stewart's office to discuss the rent and the lease. He said that Emery asked him who was "capable of doing the work quick". "I informed them that there was two contractors in town that I thought could handle the job in a hurry, the Hazelwood Company, and the Vandergrift Company"; that he introduced Emery to Douglas and to Dobson in October or November, 1945; that Emery asked Douglas at that time if he could do the work and Douglas told him he could. Beacham said that Emery wanted Douglas to get an estimate on the opening of the two doors through the walls and Douglas told him that it would take three or four weeks to give them a contract on it and suggested that he make those two doors on a cost plus basis; that way he could begin immediately, and he would only charge Mr. Emery a fair return for his time and the contracting business; that Emery took possession on the same day that he looked at the property and that the lease was to begin a month afterwards; he thought Stewart gave Emery a month and a half free rent; that Emery thought that the opening of these doors was all that. would be required; that was the first discussion; and that he heard Emery tell

Douglas to go ahead with the work. "Q. Was there anything said as to who was to pay for the work? * * * A. Yes, sir, this entire operation was based on Mr. Emery assuming the entire expense that was necessary to put him in there to operate." Beacham thought it took about eight weeks to complete the work. He said that after the doors were opened it was found that the steel posts which carried the three floors above were directly in the way of their moving the buses around, except to go directly into the repair shop. He was present when this matter was discussed and also when the repairing of the driveway from the street into the building was discussed; that the question of where to get a steel beam came up and he suggested to Douglas and Mr. Emery that Mr. Stewart could furnish the beam as he had recently purchased a garage in which there were five big pieces of steel. Douglas purchased this steel beam from Stewart, as well as a large door which went into this work, and which the plaintiff charged for. Beacham said that he did not, on behalf of the Merchandise Mart, authorize this work to be done; that he was employed by that company to show property which was for sale or lease to people interested therein, and if they were, to take them directly to Mr. Stewart who made the lease or sale. He was paid for this work. He said that he was in Stewart's office when the lease was discussed, and in this lease there was to be a provision that Emery was to pay for the alterations to the building. He stated, on cross examination, that he introduced Emery to Douglas in Douglas' office, but later stated he may be mistaken in regard to this. He was asked if it wasn't after the doors to the building had been opened that he introduced Emery to Douglas, and he said that he didn't remember if that was the first time "but that was one time we were there."

John Stewart was recalled by the plaintiff in rebuttal. He testified that he was president of the Merchandise Mart; that, Emery was brought to his office by McBeth, looking for a place to house his buses, and he referred them to Mr. Beacham, who was their rental agent, and

after they were shown the building by him they returned to his office and he agreed to rent Emery the building for $150.00 a month; that Emery took possession of the building and proceeded to make these alterations; that he gave him his permission to put a door in and he thought that that was all they were going to do. Later his attorney prepared a lease which was discussed by Emery and his attorney in his office; that they wanted to rent additional space and he agreed so to do at $75 a month additional; that Emery didn't like the lease and he told him to prepare a lease and send it to him and he would confirm it; that one of the clauses in the lease which he submitted was "that lessee shall not make any alterations or improvements in or upon said premises without the consent of the lessor", and that that clause was satisfactory to both parties; that this provision was one of the terms under which Emery took the property. He stated: "I never discussed repairing with Mr. Emery or the improvements."

On cross examination he did not remember showing Emery and Beltzhoover the steel door, and said he never had a conversation with Emery about this matter that Mr. Beltzhoover was not present. He afterward denied that he showed them the door. Stewart said that he had many conferences about the lease and that at every conference Mr. Beltzhoover wanted to change the lease. He stated he went to the building only on one occasion while the work was in progress and that his agent, Mr. Beacham, tended to the property. "Q. He had charge of that? A. No, he had charge of collecting my rents." He further said that Beacham did not have supervision of the work. He testified that he was present at the conference in Emery's office in August, 1946; that Emery did not deny liability, and that he said to him: "Emery, you owe this money. You have overspent; this is more money than you really intended to spend. I will tell you what I will do. I will give you four months' rent." Stewart said that Emery agreed to this until he talked with Mr. Beltzhoover, who said: "Nothing doing".

The plaintiff then closed his case in rebuttal and the defendant called George M. Beltzhoover, Jr., in surrebuttal. Mr. Beltzhoover testified he was present at all conferences between Stewart and the defendant. He said Stewart stated the alterations would cost between five hundred and a thousand dollars; that he could get it done in a hurry; that he knew the Hazelwood people; that he had a door and steel beams that he would use in the repair of this building, which was one of the reasons that it would not take much time; that he showed the witness and Emery the door; that he heard Stewart tell Beacham to see the contractor and arrange for these repairs; that he told Beacham to go ahead; that witness was present when Emery met Douglas in early December, 1945; that Douglas stopped in to see how the work was progessing; that they did not meet by appointment, but that the meeting between Douglas, the witness, and Emery was a mere coincidence; that he had conferences with Stewart about a lease of the property to Emery but none was executed, because they could not agree on terms. He said: "There was no statement whatever that Mr. Emery was to pay for the alteration of that building or had anything to do with it, in my hearing. The statement is absolutely false." He said the day he saw Douglas at the building there was a discussion about the entrance into the garage. The record discloses there was quite a discussion between Douglas, one of his men, and Emery and Beltzhoover, but the witness testified it was not Emery's affair, and that Emery and the witness were simply interested spectators.

The evidence shows that Beacham showed Emery the property, but Stewart made the agreement of rental; that Beacham, whose office was nearby, during the progress of the work stopped at the building to see how the work was progressing. There is no evidence that he gave any orders or direction to anyone concerning the work. Stewart says that Beacham showed people property for him, but he had no authority to contract, that he always entered into the lease or sale. That is what happened in this

case, and the mere fact that Beacham stopped at the building occasionally certainly cannot constitute him a general agent for the Merchandise Mart. We are of opinion that the effort of appellant to show agency failed.

It is certainly peculiar that Emery would spend $4,000 in improving this property, without first obtaining a lease, and it is equally peculiar that the Merchandise Mart would spend $4,000 in changing this building so as to meet the requirements of the business of the appellant, without first having entered into a written lease. The appellant, however, entered the building and remained therein until recently. There is nothing in the record to show that he has vacated the building, but it was stated at the argument he had vacated it recently.

We have studied the record carefully and quoted at length from the testimony. The testimony of both of the parties, in some respects, is unsatisfactory, but this is so in most litigation. That it is sharply contradicted is apparent.

Under Rule 9(c), Part Three, III, General Rules of Practice and Procedure (1945) of this Court, it is our duty to "review upon both the law and the evidence, but the judgment of the trial court shall not be set aside on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses". We cannot say that the lower court was clearly wrong, and the judgment will be affirmed.

*Judgment affirmed, with costs to appellee.*